UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JONATHAN MANLOVE, individually and on behalf of others similarly situated, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) ) |
| VOLKSWAGEN AKTIENGESELLSCHAFT et al., | ) ) ) ) |
| *Defendants*. | ) |

Case No. 1:18-cv-145

Judge Travis R. McDonough

Magistrate Judge Christopher H. Steger

**MEMORANDUM AND ORDER**

Before the Court is Plaintiff Jonathan Manlove's motion for collective-action certification and related relief pursuant to Title 29, United States Code, Section 216(b) (Doc. 73) and Defendants' (collectively, "Volkswagen") motion for oral argument on Manlove's motion for collective-action certification (Doc. 96). For the reasons that follow, Defendants' motion (Doc. 96) will be **DENIED IN PART**[1] and Manlove's motion (Doc. 73) will be **GRANTED IN PART** and **DENIED IN PART**.

I. **VOLKSWAGEN'S REQUEST FOR ORAL ARGUMENT**

Volkswagen has requested oral argument on Manlove's motion, very generally citing the "complexity of the underlying fact pattern giving rise to the Motions, the various controlling legal standards, and the impact the Court's rulings will have on the scope of this litigation." (*Id.* at 2.) Volkswagen somewhat more specifically asserts that the Court's decision on Manlove's

---

[1] The Court will **RESERVE RULING** on Volkswagen's request for oral argument (Doc. 96) on its motion for judgment on the pleadings as to the class allegations, or, alternatively, motion to strike class allegations (Doc. 88).

motion will impact the scope of discovery and the resources the parties devote to this litigation (*id.* at 3), but that is no different than any other decision the Court will ever make about whether to conditionally certify a collective action. Volkswagen also urges the Court that oral argument is necessary to ensure the parties' positions are "fully presented" to the Court (*id.*), but it does not describe what issues the parties have been unable to adequately brief.[2] Volkswagen, finally, gives one example of an issue it wishes to discuss further at oral argument:

> the procedural impact of Plaintiff's unprecedented bifurcated forum case structure and Plaintiff's recently-expressed intent to seek individualized liability determinations in this litigation on behalf of putative opt-ins who are simultaneously seeking the exact same determinations in arbitration.

(*Id.* at 3–4.) But it was the parties' arbitration agreement (Doc. 29-1)—along with Volkswagen's motion to compel arbitration (Doc. 31)—that resulted in litigation over the same alleged age discrimination before both an arbitrator and this Court. (*See* Doc. 57, at 5–6.) The procedural bifurcation is exactly what Volkswagen designed: the arbitrator will decide claims for damages, and this Court will decide claims for injunctive relief. (*Id.*) Although there are many questions about why the parties agreed to divide their disputes between two forums, those questions' answers will not impact how the parties' dispute will move forward: this Court will "secure the just, speedy, and inexpensive determination" of this action for injunctive relief, Fed. R. Civ. P. 1, and the arbitrator will proceed as he sees fit. "There's what's right, and there's what's right, and never the twain shall meet." *Raising Arizona* (Circle Films 1987). Volkswagen's request for oral argument on Manlove's motion for collective-action certification will be **DENIED**.

---

[2] Volkswagen squandered pages of its response brief by focusing on factual disputes and standards of review that do not apply to this stage of the proceedings. (*See, e.g.*, Doc. 87, at 17–18 (detailing "Plaintiff's Proposed Framework"); *id.* at 19–23 (invoking Defendants' evidence to undermine Manlove's allegations).)

## II.  COLLECTIVE-ACTION CERTIFICATION

Manlove moves the Court to conditionally certify a collective action based on his ADEA claims.  (Doc. 73.)  Manlove asserts that the members of his proposed collective action, Volkswagen employees in the United States fifty years of age or older, are "similarly situated" under the applicable standard, *see* 29 U.S.C. § 216(b), because they are all "potential victims" of Volkswagen's Pact for the Future (the "Pact").  (Doc. 74, at 12.)  Volkswagen opposes conditional certification, arguing that the Pact does not render the putative collective-action members similarly situated, first because Manlove's allegations about the Pact are conclusory and unsupported, and second because Manlove has offered no other evidence supporting conditional certification.  (*See generally* Doc. 87.)

### A.  Factual Background

#### i. *Volkswagen's Pact*

Volkswagen Aktiengesellschaft ("Volkswagen AG"), a German corporation, manufactures automobiles at production plants throughout the world.  (Doc. 12, at 6–7.)  Volkswagen Group of America, Inc. ("Volkswagen America"), a wholly-owned subsidiary of Volkswagen AG, is the "operational headquarters for [its] presence in North America."  (*Id.* at 7.)  Volkswagen Group of America Chattanooga Operations, LLC ("Volkswagen Chattanooga") is a wholly-owned subsidiary of Volkswagen America which "operates the Volkswagen Chattanooga Assembly Plant in Chattanooga, Tennessee."  (*Id.*)

On November 18, 2016, Volkswagen AG announced the Pact, which included the elimination of 23,000 jobs in Germany and 7,000 jobs outside Germany, primarily in South America.  (Doc. 43-1, at 2–3.)  Volkswagen AG asserted in press releases that the Pact would improve Volkswagen's profitability both inside and outside Germany.  (*E.g.*, *id.* at 4.)

In March 2017, Volkswagen transferred Nicole Koesling from one of Volkswagen AG's German subsidiaries to Chattanooga. (Doc. 54-2, at 5; Doc. 83-2, at 2.) In her role as Volkswagen Chattanooga's Senior Vice President of Human Resources, Koesling makes employment-termination decisions. (*See, e.g.*, Doc. 83-3, at 4 (Koesling's termination of Virgil Yeager); *id.* at 5 (Koesling's termination of Ricky Orr).)

On June 26, 2017, Volkswagen AG issued a press release in which Dr. Diess stated, "We are becoming slimmer, leaner and younger. This will make Volkswagen faster and more efficient at the same time as providing new motivation for junior managers." (Doc. 54-2, at 29.) The release also announced that "the selection of junior managers" would change "at the Volkswagen brand." (*Id.* at 30.) Assessment centers would "be abolished" and replaced with "an introductory year with a specific management task before [employees] are finally appointed to a management position." (*Id.*)

Kranke, Volkswagen Chattanooga's Director of Plant Infrastructure, transferred from Volkswagen AG around January 2018. (Doc. 74-4, at 2.) Kranke has participated in human-resources decisions, including promotions and reassignments. (*See, e.g.*, *id.* at 2 (Kranke's discussions with Orr involving Orr's potential promotion); *id.* at 3 (Kranke's directions to Orr to reassign an employee eligible for retirement).)

Manlove, Orr, Yeager, and Laura Carter all claim to be victims of Volkswagen's alleged age-related discriminatory initiative. (*See* Doc. 74-3, at 3 (referencing a "Company-wide initiative to create a younger workforce and eliminate older employees"); Doc. 74-2, at 9 ("Volkswagen has systematically discriminated against older workers under its Pact for the Future."); Doc. 74-4, at 3 (stating his termination was "part of a Company-wide initiative to create a younger workforce and eliminate older employees"); Doc. 74-5, at 3 ("The

4

discrimination that I suffered only worsened after Volkswagen officially announced its Pact for the Future. I believe that the Pact for the Future formalized and exacerbated a long-standing company policy and practice of age discrimination.").)[3]

### ii. *Manlove*

Manlove is fifty-four years old. (Doc. 74-2, at 1.) He began working at Volkswagen Chattanooga in 2011 as a Level-6 Supervisor in the Production Department. (*Id.*) After a transfer, a promotion, and another transfer, he eventually became a Level-9 Assistant Manager of In-House Logistics. (*Id.*) Manlove received "positive performance reviews" in all of those positions. (*Id.*)

At the end of 2016 and the beginning of 2017, three employees around forty years of age or younger were promoted to open Assistant Manager positions in Logistics, though not in In-House Logistics, where Manlove worked. (Doc. 38-1, at 2.) Volkswagen did not post these open positions, because the younger employees "had already been slated to fill the open Assistant Manager positions in their respective departments." (Doc. 54-1, at 5.)

In late March 2017, Manlove's supervisor, Jim Williamson, retired. (Doc. 54-3, at 2.) Volkswagen Chattanooga did not post Williamson's position and never offered Manlove the opportunity to apply for the position. (Doc. 74-2, at 2.) Very soon, Amanda Lovin, who was in her early thirties, filled the position. (*Id.*; Doc. 54-3, at 2.)

Upon becoming Manager of In-House Logistics, Lovin decided to restructure the department, resulting in a reduction from five Assistant Managers to three. (Doc. 54-3, at 3.) Lovin assigned the two younger Assistant Managers in Logistics—Gina Keller and Greg Harbison—to two of the three new Assistant Manager positions. (*Id.* at 2; Doc. 54-1, at 5.) She

---

[3] Carter, Orr, and Yeager define "Company" to refer to Defendants collectively. (*See* Doc.74-3, at 1; Doc. 74-4, at 1; Doc. 74-5, at 1.)

assigned Cornwell, the oldest of the five original Assistant Managers, to the third new Assistant Manager position.[4] (Doc. 54-3, at 4, 6.) Manlove and Davis, both over fifty years old, were demoted. (Doc. 74-2, at 1, 3; Doc. 54-1, at 5; Doc. 54-3, at 4, 6.) Volkswagen Chattanooga eliminated no other positions in Logistics at that time. (Doc. 38-1, at 2.) Paulo Montero, Lovin's supervisor, and Robert Eggeling, head of Logistics, approved Lovin's decisions. (Doc. 54-3, at 5.)

Manlove currently works as a Level-6 Supervisor in Assembly, a department within Manufacturing, where he is "responsib[le] for direct supervision of team members working on the assembly line." (Doc. 83-1, at 2; Doc. 54-6, at 6.)

On June 29, 2018, Manlove filed this action. (Doc. 1.) Within two weeks, Manlove learned that he would be moved from Assembly's Cockpit line to the more mentally and physically difficult BA2 line. (Doc. 74-2, at 6.) Jody Kerns, the Assistant Manager in Assembly who supervises Manlove, now considers him the "worst performing" of his eight direct reports. (Doc. 83-1, at 3.) He gave Manlove a "partially meets requirements" rating for 2018. (*Id.*; Doc. 84-1, at 5.)

### iii. *Carter*

Carter is fifty-seven years old. (Doc. 74-3, at 1.) From February 2012 through January 2017, Volkswagen Chattanooga employed her as a Level-8 Senior Buyer in Purchasing. (*Id.*) In January 2017, the Purchasing Department became part of Volkswagen America. (Doc. 74-3, at 1–2.) Throughout her time at both Volkswagen Chattanooga and Volkswagen America, she "consistently received positive performance reviews" and received a raise every year. (*Id.* at 2.)

---

[4] Manlove considers Cornwell's reassignment a demotion because he had previously supervised ninety employees, but only twelve in the new role. (Doc. 54-6, at 7.) Lovin disputes this characterization in part because Cornwell gained new responsibilities over non-employees and contractors. (Doc. 54-3, at 6.)

6
Case 1:18-cv-00145-TRM-CHS   Document 100   Filed 06/11/19   Page 6 of 19   PageID #: 1363

Volkswagen America terminated Carter on March 26, 2018, informing her that she had violated a company policy. (*Id.*) Volkswagen America filled Carter's position with a "much younger employee." (*Id.* at 3.)

### iv. *Orr*

Orr is fifty-two years old. (Doc. 74-4, at 1.) Throughout his time at Volkswagen, he "consistently received positive performance reviews placing [him] in the top 5% of employees at the Chattanooga Plant." (*Id.*) As an Assistant Manager, Orr supervised 125 full-time employees and 200 third-party contractors and was responsible for directing day-to-day maintenance operations for the Chattanooga facility. (*Id.*)

Around August 2016, Christian Koch, then Chief Executive Officer ("CEO") of Volkswagen Chattanooga, told Orr that, if he took on the additional responsibility of managing the General Sales Department without any additional compensation, he would be promoted to Manager of both the Facilities Department and the General Sales Department. (*Id.* at 2.) In 2017, Antonio Pinto replaced Koch as CEO of Volkswagen Chattanooga. (*Id.*) When Orr met with Pinto around January 2018 to discuss his expected promotion, Pinto said "he would need at least six-months [sic] to evaluate [Orr's] performance before considering [him] for a promotion to Manager." (*Id.*) About two weeks later, Volkswagen Chattanooga surprised Orr by naming him Acting Interim Manager of Plant Infrastructure, a role previously split among five different employees, again without increasing his compensation. (*Id.*)

Also around January 2018, Kranke transferred from Volkswagen AG in Germany to become Director of Plant Infrastructure at Volkswagen Chattanooga. (*Id.*) When Orr met with Kranke to discuss his promotion, Kranke said that before Orr could become Manager he needed

7

to complete the Management Assessment Center ("MAC"), but that Orr was *"too old"* to be included in the MAC program. (*Id.* (emphasis in original).)

Volkswagen terminated Orr on August 24, 2018, for bypassing Volkswagen Chattanooga's bid process and internal-review procedures. (Doc. 74-4, at 3; Doc. 83-3, at 5.) Koesling made the final decision. (Doc. 83-3, at 5.)

### *v. Yeager*

Yeager is sixty-five years old. (Doc. 74-5, at 1.) From April 26, 2010, through October 3, 2018, Yeager worked for Volkswagen Chattanooga. (*Id.*) He received positive performance reviews and a bonus every year. (*Id.* at 2.) Around June 2010, he interviewed for a Specialist position and was told he was a "strong candidate[.]" (*Id.*) However, in October 2010, Volkswagen Chattanooga instead hired "an external candidate in his early thirties" for the Specialist position. (*Id.*)

Yeager trained new, younger, less-educated, and less-experienced Joining Technicians, many of whom were promoted before him. (*Id.*) Volkswagen Chattanooga took four years to promote Yeager to Measurement Technology Specialist. (*Id.* at 2; Doc. 83-3, at 3.) Although his replacement was "in his twenties" and had "almost no relevant work experience[,]" that employee was promoted to a Specialist-level position in the Joining Department in less than a year. (Doc. 74-5, at 2.) Between 2012 and late 2016, Yeager applied for thirteen positions within Volkswagen Chattanooga, received only two interviews, and received only one offer, the Measurement Specialist position he accepted. (*Id.* at 3.) When he became a Measurement Specialist, Volkswagen Chattanooga assigned him to train five new Measurement Specialists, all younger than fifty. (*Id.* at 2–3.) Within about a year, all five of them moved out of Tactical into "more sought-after roles." (*Id.* at 3.)

Around January 2017, Volkswagen Chattanooga hired Alan Trantham as a Measurement Specialist and gave him Yeager's desk. (*Id.* at 3–4.) Yeager was moved to a wall-hanging table, which had less space than the desk. (*Id.* at 4.) At the time, Trantham was "in his twenties" and held a Level-4 position, while Yeager was a Level-5 employee who had worked for Volkswagen for seven years. (*Id.* at 3–4.) Yeager was "highly embarrassed and humiliated." (*Id.* at 4.) Then, around 2018, he applied for the Level-7 position of Measuring Analysis Specialist. (*Id.*) Although Yeager possessed all of the skills listed in the job description and had four years of experience working in the Measurement Department, another much younger candidate with "no Measurement experience" was selected for the position. (*Id.*)

Volkswagen fired Yeager on October 3, 2018, after he failed a random drug test. (Doc. 83-3, at 3–4.) Koesling made the final decision. (*Id.* at 4.)

### B. Procedural History

Manlove filed his complaint on June 29, 2018 (Doc. 1), and an amended complaint on September 18, 2018 (Doc. 12). In both his original and amended complaints, he seeks injunctive relief against Volkswagen Chattanooga and its affiliates, Volkswagen America and Volkswagen AG. (Docs. 1, 12.) He asserts: (1) individual and collective age-discrimination claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); and (2) individual and class claims under the Tennessee Human Rights Act ("THRA"), Tennessee Code Annotated § 4-21-101 *et seq.*, pursuant to Federal Rule of Civil Procedure 23. (Doc. 12, at 3, 21.) Following a brief diversion of this matter to an arbitrator, Manlove moved for conditional certification of his ADEA claim pursuant to 29 U.S.C. § 216(b), seeking to represent himself and other employees who are similarly situated with respect to his ADEA claims. (Doc. 73.)

Manlove's motion for conditional collective-action certification (Doc. 73) is now ripe for the Court's review.[5]

### C. Standard of Law

The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Employees can sue on their own behalf and on behalf of "similarly situated" persons as part of a collective action. 29 U.S.C. § 626(b) (incorporating the collective-action provision of the FLSA, 29 U.S.C. § 216(b), into the ADEA); *see Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 167 (1989) (explaining same). "Section 216(b) establishes two requirements for a representative action: 1) the plaintiffs must be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (citing 29 U.S.C. § 216(b)).[6] Employees "whose 'claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct,' are similarly situated." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 398 (6th Cir. 2017) (quoting *O'Brien v. Ed*

---

[5] Manlove has not yet moved for class certification of his claim under the THRA.

[6] Because the ADEA incorporates language from the FLSA, cases involving conditional certification of FLSA claims are instructive in evaluating whether to conditionally certify a collective action based on ADEA claims. Volkswagen argues that the "similarly situated" standard differs between ADEA and FLSA and that the two types of actions "differ markedly in substance and methods of proof." (Doc. 87, at 15.) Volkswagen points out, for example, that an FLSA showing will generally be easier because "pay practices tend to be uniform and, unlike the ADEA, the FLSA does not require a showing of discriminatory intent . . . ." (*Id.*) Volkswagen relies on cases that merely discuss differences between the elements of ADEA and FLSA claims and how those differences might affect collective actions brought under each statute. The cases do not establish that motions for conditional collective-action certification for ADEA claims are reviewed under a different standard than motions for conditional collective-action certification for FLSA claims. (*See id.*)

*Donnelly Enterprises, Inc.*, 575 F.3d 567, 584–85 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016)).

Courts typically use a "two-phase inquiry" to determine "whether proposed co-plaintiffs are, in fact, similarly situated for the purposes of the statute's requirements." *Id.* The first phase, the notice phase, occurs at the beginning of discovery. *Id.* In this phase, the district court determines whether conditional certification is appropriate and whether notice of the lawsuit should be given to similarly situated putative class members. *Id.* To demonstrate that conditional certification is appropriate at the notice stage, the "plaintiff must show only that 'his position is similar, not identical, to the positions held by the putative class members.'" *Id.* at 546–47 (citations and quotation marks omitted). To satisfy this "fairly lenient standard," the plaintiff must make a "modest factual showing" that he and potential co-plaintiffs are similarly situated with respect to the conduct alleged in the complaint. *Id.* at 547 (internal citations and quotations omitted). Courts do not consider non-moving parties' evidence at this stage. *Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642 (W.D. Tenn. 2009) ("At this stage the Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations."); *Thompson v. RGT Mgmt., Inc.*, No. 2:11-CV-02573-AJT, 2012 WL 3261059, at *3 (W.D. Tenn. June 8, 2012), *report and recommendation adopted,* No. 11-02573, 2012 WL 3260431 (W.D. Tenn. Aug. 8, 2012) ("Courts at the 'notice stage' consider whether affidavits of potential plaintiffs were submitted and whether some evidence of a widespread discriminatory plan was submitted."). This standard "'typically results in conditional certification of a representative class' . . . during the first stage of the class certification process." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (quoting *Comer*, 454 F.3d at 547).

The second stage occurs after discovery and is undertaken if and when the defendant moves the court for decertification of a conditional class. *Comer*, 454 F.3d at 546. At the second phase, the Court has more evidence and uses a stricter standard to evaluate whether co-plaintiffs are indeed similarly situated. *Id.*; *see also Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 671 (6th Cir. 2012) ("Plaintiffs generally must produce 'more than just allegations and affidavits' demonstrating similarity in order to achieve final certification."). For the purposes of final collective-action certification, relevant considerations for determining whether putative class members are similarly situated include: the "factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien*, 575 F.3d at 584 (internal quotation marks and citations omitted); *see, e.g.*, *Monroe*, 860 F.3d at 402 (applying the *O'Brien* factors).

### D. Analysis

Manlove asks the Court to certify a collective action of "Volkswagen employees in the U.S. age fifty or above."[7] (Doc. 74, at 12.) He argues that the putative class members are

---

[7] Volkswagen asserts that Manlove must show that current—as well as former—Volkswagen employees over fifty years old are similarly situated. (Doc. 87, at 18.) In his amended complaint, Manlove defines the proposed collective action inconsistently. (*Compare* Doc. 12, at 20 (bringing the collective-action claims "on behalf of all Volkswagen employees in the United States age fifty (50) and over"), *with id.* at 29 (defining the collective action as including "all current and former United States employees of Volkswagen age fifty (50) and older").) Manlove adds to this imprecision by describing three former employees as "Opt-in Plaintiffs" Yeager, Carter, and Orr. (Doc. 74, at 14; *see* Doc. 83-3, at 3–4, 5; Doc. 74-3, at 2.)

In the first sentence of Manlove's memorandum in support of the motion for conditional certification, he defines the proposed members as "Volkswagen employees in the U.S. age fifty or above" (Doc. 74, at 12), plainly excluding former employees. Additionally, Manlove relies on argument grounded in the exclusion of former employees. For example, he asserts that "[a]n injunction against the Pact would uniformly benefit class members by removing this shared obstacle to their advancement." (*Id.*) Notwithstanding the amended complaint's more inclusive

similarly situated because the Pact "represents a single discriminatory policy, plan, or scheme to which all class employees are potential victims." (*Id.*) Volkswagen responds that Manlove has not shown the putative class members are similarly situated, because "plaintiff [has] proffered nothing more than four discrete employment circumstances of four declarants" without a "common unifying nexus" or "unified policy tying individual claims together." (Doc. 87.)

Although a "unified policy" is not required for collective-action certification, *O'Brien*, 575 F.3d at 584, a modest factual showing of such a policy is sufficient for conditional certification, *see, e.g.*, *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 373 (E.D. Tenn. 2006) ("At the notice stage, all that is required is substantial allegations supported by declarations, and once the plaintiff has met that burden, the case may be conditionally certified as a collective action . . . ."). Contrary to Volkswagen's contentions, Plaintiff has, of course, alleged a "unified policy": the Pact. In a press release announcing the Pact, Volkswagen announced its plan to cut 7,000 jobs outside of Germany. (Doc. 43-1, at 2–3.) Volkswagen AG's CEO has made statements, on behalf of the entire Volkswagen brand, that arguably indicate a preference for younger employees. (Doc. 54-2, at 29.) The Court will not, at this stage, consider Volkswagen's evidence disputing that the Pact has been effected in the United States. (*E.g.*, Doc. 83-2, at 2–3); *see Brasfield*, 257 F.R.D. at 642 ("At this stage the Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations."); *Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 596 (S.D. Ohio 2002) (explaining that plaintiffs need only provide a "colorable basis" that the putative class of similarly situated plaintiffs exists). Manlove has plausibly alleged that the Pact constitutes a unified policy of age discrimination that applies to Volkswagen employees in the United States.

---

collective-action definition, Manlove has only moved to certify a collective action of present employees.

Manlove has also produced evidence that Volkswagen Chattanooga and Volkswagen America have taken adverse actions based on age towards employees in Chattanooga. (*See generally* Docs. 74-3, 74-4, 74-5.) Manlove has shown that, after the Pact was announced, Volkswagen transferred at least two high-level executives, Koesling and Kranke, to Chattanooga and gave them authority over human-resources decisions, including promotions, reassignments, and terminations. (Doc. 83-2, at 2; Doc. 54-2, at 5; Doc. 83-3, at 4; Doc. 74-4, at 1.) Carter, Orr, and Yeager allege facts that support their claims that they were victims of the Pact.[8] (*See* Doc. 74-3, at 2; Doc. 74-4, at 2–3; Doc. 74-5, at 3–5.) They, as well as Manlove, claim that Volkswagen has implemented the Pact in Chattanooga by preferring younger workers for training opportunities and promotions and by making older workers' positions more difficult until they quit or retire. (*See* Doc. 74-2, at 3–7; Doc. 74-3, at 2; Doc. 74-4, at 2–3; Doc. 74-5, at 3–5.)

The exact methods of discrimination, as well as the decisionmakers involved, may well vary among the putative collective-action members. (*See* Doc. 87, at 12.) Perhaps at the second stage of the certification process, Volkswagen will demonstrate that putative collective-action members' circumstances are so dissimilar that they do not "possess the same interest" and will not "suffer the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352–53 (2011). However, for the purposes of this first stage of the certification process, Manlove has made a modest factual showing that Volkswagen employees in Chattanooga are similarly situated with regard to facts underlying their claims and how the Pact might impact their employment setting.

---

[8] Defendants assert that Carter, Orr, and Yeager lack standing because this action is limited to injunctive relief and they are former, not current, Volkswagen employees. (Doc. 87, at 11.) Witnesses are not subject to the strictures of standing. *See* Fed. R. Evid. 601 ("Every person is competent to be a witness unless these rules provide otherwise."); Fed. R. Evid. 602 (requiring personal knowledge).

*See Wlotkowski v. Mich. Bell Tel. Co.* 267 F.R.D. 213, 219 (E.D. Mich. 2010) (noting that the defendant could move for decertification or to divide the class into subclasses "[i]f, after discovery, defendant shows that any differences among the class members make it too difficult to decide their claims together" (internal quotation marks omitted)); *Dallas v. Alcatel-Lucent USA, Inc.*, No. 09-14596, 2012 WL 424878, at *6 (E.D. Mich. Feb. 9, 2012).

On the other hand, although Manlove's proposed collective action includes employees at more than thirty-five locations in more than fourteen states (Doc. 87-3, at 1), there is no evidence in the record about any adverse actions taken at locations outside of Chattanooga. Manlove has not made the required modest factual showing that Volkswagen employees over fifty at Volkswagen locations outside Chattanooga are similarly situated to those in Chattanooga.

In sum, Manlove has made a modest showing that Volkswagen Chattanooga and Volkswagen America employees over fifty within Chattanooga are similarly situated but has not shown that the Pact has comparably impacted Volkswagen employees over fifty in the United States outside Chattanooga. *Cf. Thompson v. RGT Mgmt., Inc.*, No. 2:11-CV-02573-AJT, 2012 WL 3261059, at *3 (W.D. Tenn. June 8, 2012), *report and recommendation adopted,* No. 11-02573, 2012 WL 3260431 (W.D. Tenn. Aug. 8, 2012) ("The court finds the lack of supporting affidavits troublesome when considering whether to conditionally certify a class for an alleged widespread classification issue."). Accordingly, the Court will **GRANT IN PART** Plaintiff's motion and certify a collective action only on behalf of all Volkswagen Chattanooga and Volkswagen America's current employees who work in Chattanooga and are fifty years of age or older.

15
Case 1:18-cv-00145-TRM-CHS Document 100 Filed 06/11/19 Page 15 of 19 PageID #: 1372

### III. NOTICE TO PUTATIVE MEMBERS OF THE COLLECTIVE ACTION

Courts may supervise the issuance of notice in ADEA collective actions. *Hoffman-La Roche*, 493 U.S. at 169. The ADEA grants courts the requisite procedural authority to "manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to the statutory commands or the provisions of the Federal Rules of Civil Procedure." *Id.*

Manlove requests that the Court order Volkswagen to provide a list of names, last-known addresses, and other available contact information for employees within the scope of the collective action. Volkswagen chose not to address this request. (*See generally* Doc. 87.) The Court will order Volkswagen to provide a list of names, last-known addresses, and other available contact information for all of their current employees of fifty years of age or older in Chattanooga.

The parties have not proposed any further notice procedures. The Court will **ORDER** parties to work together on the form, substance, and timing of notice, and to file an agreed proposed order addressing the notice procedures they will follow, within twenty days of the date of this order.

### IV. EQUITABLE TOLLING

Manlove requests that the Court order equitable tolling of class members' individual claims for damages, which they presently anticipate resolving in arbitration after the resolution of this suit for injunctive relief.[9] (Doc. 74, at 34.) Defendants object to equitable tolling for as-yet-unidentified plaintiffs and argue that the appropriateness of tolling in individual arbitrations should be left to the arbitrator to decide. (Doc. 87, at 33.)

---

[9] The Court assumes Manlove intended to request equitable tolling for damages claims of both putative collective-action members and class members in this proceeding.

Consideration of equitable tolling for claims brought in arbitration not only should be, but must be, left to the arbitrator. The Court lacks authority to order equitable tolling of claims for relief that are, by the terms of the parties' arbitration agreements, exclusively reserved for arbitration. The Federal Arbitration Act "requires that we interpret [arbitration agreements] as written" and "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by clear and unmistakable evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529–30 (2019) (internal quotation marks omitted). Manlove and Volkswagen's arbitration agreement states that "[t]he statutes of limitations otherwise applicable under law shall apply to all Claims made in the arbitration." (Doc. 29-1, at 5.) The arbitration agreement also clearly delegates to the arbitrator exclusive authority over "interpretation" of the entire agreement (*id.* at 6); thus, only the arbitrator has the authority to interpret the agreement's statute-of-limitations provision to determine whether equitable tolling is available for arbitrable claims. *See Schein*, 139 S. Ct. at 530 (internal quotation marks omitted).

Even if the Court had the authority to grant equitable tolling under these circumstances, it would decline to do so. "Federal courts sparingly bestow equitable tolling." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)). Typically, equitable tolling applies only when a party's failure to timely file suit "unavoidably arose from circumstances beyond that litigant's control." *Id.* at 561 (citing *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984)). The parties' own arbitration agreements require putative class members to seek injunctive relief in this Court and damages in a separate, individually filed arbitration proceeding. (*See* Doc. 29-1, at 5.)

17
Case 1:18-cv-00145-TRM-CHS   Document 100   Filed 06/11/19   Page 17 of 19   PageID #: 1374

Manlove argues that if the Court does not grant equitable tolling now, there will be "uncertainty regarding the statute of limitations and whether class members need to file in arbitration to preserve their individual claims during the pendency of this case." (Doc. 74, at 35.) He argues that equitable tolling, here, logically extends from Supreme Court precedent. (*Id.*) In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court created a rule tolling the applicable statute-of-limitations period for putative class members' individual claims within that forum, during the period from the action's commencement until a court declines to certify a class action. *Id.* at 553–56. At its core, the holding in *American Pipe* seeks both to protect "passive" class members from unwittingly losing their claims and to avoid requiring more active ones to proceed on both a class and individual basis when such duplication may ultimately be unnecessary. *Id.* at 551–53. In this case, by contrast, given the arbitration agreement,[10] there is no hope of efficiently resolving all claims in a single proceeding. The Court will not further add to the inefficiency by dabbling in decisions that might dictate one result or another in arbitration. The arbitrator can decide whether to grant equitable tolling. Additionally, even in the absence of equitable tolling, the uncertainty to which Manlove points does not exist. If claimants want to recover damages, they must submit an arbitration claim, unless the arbitrator decides to proceed on a class basis. The Court will not, in this proceeding for injunctive relief, effectively order the arbitrator to toll the limitation periods applicable to a separate arbitration proceeding for damages. The resolution of the issues before this Court will not resolve the issues before the arbitrator.

Accordingly, the Court will **DENY** Manlove's motion for equitable tolling.

---

[10] The Court assumes that Volkswagen subjected every Chattanooga employee to arbitration agreements identical to the one Manlove signed.

## V. CONCLUSION

For the reasons stated herein, Volkswagen's motion for oral argument on Manlove's motion for collective-action certification and on Volkswagen's motion for judgment on the pleadings (Doc. 96) is **DENIED IN PART**, to the extent it requests oral argument on Manlove's motion for conditional certification; the Court **RESERVES RULING** on Volkswagen's request for oral argument on its motion for judgment on the pleadings. Manlove's motion (Doc. 73) is **GRANTED IN PART** and **DENIED IN PART**. The Court **CONDITIONALLY CERTIFIES** a collective action under the ADEA of all current employees of Volkswagen Chattanooga and Volkswagen America who work in Chattanooga and who are fifty years of age or older. The Court **ORDERS** Defendants to disclose the names, last-known addresses, and other available contact information for all putative collective-action members, within twenty days of the date of this order. The Court further **ORDERS** parties to file an agreed proposed order addressing the form, substance, and timing of notice, within twenty days of the date of this order. The Court **DENIES** Manlove's request for equitable tolling.

SO ORDERED.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**